# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the*<br>*person by name and address)*<br><br>The person of SERENA LIEU, as described in<br>Attachment A | )<br>)<br>)<br>)<br>)<br>) |

Case No. 23-MJ-00706

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956(a)(1)(B)(i) | Laundering of Monetary Instruments |
| 18 U.S.C. § 1957(a) | Transactional Money Laundering |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1344 | Bank Fraud |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Austin Anderson*
_____
*Applicant's signature*

FBI SA Austin Anderson
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Los Angeles, CA</u>

Hon. Patricia Donahue, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: David C. Lachman (x5564)

## **ATTACHMENT A**

PERSON TO BE SEARCHED

The person to be searched is SERENA LIEU, date of birth June 20, 1967, described as an Asian female, approximately 5'0" tall, weighing 110 pounds, with black hair and brown eyes, at whatever location she is found.  The search of LIEU shall include any and all clothing and personal belongings, computers, digital devices, digital storage devices or other storage media/medium, briefcases, backpacks, wallets, and purses, that are within LIEU's immediate vicinity and control at the location where the search warrant is executed.

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 1956(a) (Laundering of Monetary Instruments), 18 U.S.C. § 1957(a) (Transactional Money Laundering), 18 U.S.C. § 1343 (Wire Fraud), and 18 U.S.C. § 1344 (Bank Fraud) (the "Subject Offenses"), namely:

a.   Records, documents, programs, applications, or materials relating to banking and financial institution records, wire transfer records, bank statements, cancelled checks, deposit slips, check registers, record of money orders, cashier's checks, and official bank checks, savings passbooks and statements of account(s), safe deposit box keys and records and business and personal ledgers evidencing financial transactions.

b.   Records, documents, programs, applications, or materials reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of funds, financial records, records that may indicate ownership of cash and funds, including calendars, address books, telephone or other contact lists, hard copy correspondence, notes, photographs, and videos.

c.   Records and documents relating to the identity or location of any co-conspirators;

d.   Records and information relating to or reflecting LIEU's motive or state of mind in relation to the crimes under investigation;

e.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

f.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   applications, programs, software, documentation, manuals, passwords, keys, and other access

devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

vii. records of or information about Internet Protocol addresses used by the device.

2.    As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.  <u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the scope of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device
if the government, prior to the end of the search period,
obtains an order from the Court authorizing retention of the
device (or while an application for such an order is pending),
including in circumstances where the government has not been
able to fully search a device because the device or files
contained therein is/are encrypted.

h.    After the completion of the search of the digital
devices, the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

5.    The review of the electronic data obtained pursuant to
this warrant may be conducted by any government personnel
assisting in the investigation, who may include, in addition to
law enforcement officers and agents, attorneys for the
government, attorney support staff, and technical experts.
Pursuant to this warrant, the investigating agency may deliver a
complete copy of the seized or copied electronic data to the
custody and control of attorneys for the government and their
support staff for their independent review.

6.    During the execution of this search warrant, law
enforcement is permitted to: (1) depress SERENA LIEU's thumb
and/or fingers onto the fingerprint sensor of the device (only
when the device has such a sensor), and direct which specific
finger(s) and/or thumb(s) shall be depressed; and (2) hold the
device in front of SERENA LIEU's face with his or her eyes open
to activate the facial-, iris-, or retina-recognition feature,

in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

7.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## **AFFIDAVIT**

I, Austin Anderson, being duly sworn, declare and state as follows:

### **I.  PURPOSE OF AFFIDAVIT**

1.    This affidavit is made in support of an application for a warrant to search the person of SERENA LIEU ("LIEU"), as further described in Attachment A, for the items to be seized described in Attachment B, which are the evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1956(a)(1)(B)(i) (Laundering of Monetary Instruments), 18 U.S.C. § 1957(a) (Transactional Money Laundering), 18 U.S.C. § 1343 (Wire Fraud), and 18 U.S.C. § 1344 (Bank Fraud) (the "SUBJECT OFFENSES"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

2.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

## II. <u>BACKGROUND OF AFFIANT</u>

3.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since August 2021.  As a requirement for employment as an FBI Special Agent, I successfully completed the New Agent Basic Field Training Course located at the FBI Training Academy in Quantico, Virginia.  As a function of my assignment, I have received both formal and informal training from the FBI and other institutions regarding computer technology, financial investigations, cryptocurrency, and organized crime.  I received Bachelor of Science Degrees in Accounting and Finance from the University of Utah.  Before joining the FBI, I was employed as a staff accountant from October 2019 to May 2021.

4.    As a Special Agent with the FBI, my job duties include the investigation of organized crime groups using advanced technology to conduct large scale computer-enabled and computer-facilitated crime, including violations of the SUBJECT OFFENSES.

5.    I have conducted and participated in criminal investigations for violations of federal and state laws including, but not limited to, computer-based financial crimes, money laundering, fraud, drug trafficking, and other organized criminal activity.  I have prepared, executed, and assisted in numerous search and arrest warrants.  I have also conducted and participated in criminal and administrative interviews of witnesses and suspects.  I am familiar with the formal methods of money investigations, including, but not limited to, electronic surveillance, visual surveillance, general

questioning of witnesses, search warrants, confidential informants, the use of undercover agents, and analysis of financial records.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

6.    In 2019, FBI agents learned that a bank account controlled by LIEU had received a wire transfer of $103,350 from a Business Email Compromise ("BEC") victim in the Dallas area. During a May 2019 interview, FBI agents advised LIEU that she was moving fraud proceeds in and out of her various bank accounts, and gave her a money mule warning letter, which she signed.  LIEU had opened at least 11 bank accounts at seven separate financial institutions since 2017.  Despite the warning, LIEU continued trafficking fraud proceeds.  Between July 2019 and April 2021, LIEU received over $1.8 million into various bank accounts.  These funds came directly from fraud victims who were tricked into sending the funds to accounts controlled by LIEU, rather than to the victims' intended recipients.  After receiving this money, LIEU quickly withdrew or transferred it to various individuals or entities, including by converting the funds into cryptocurrency.

7.    On February 14, 2023, a federal grand jury returned an indictment charging LIEU with three counts of violating 18 U.S.C. § 1956(a) (Laundering of Monetary Instruments) and three counts of violating 18 U.S.C. § 1957(a) (Transactional Money Laundering).

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

8.    Based on my review of law enforcement reports, conversations with other law enforcement officers, and my own participation in this investigation, I know the following:

9.    The United States is investigating trafficking in fraud proceeds and money laundering linked to various frauds, including Business Email Compromise scams.  Between July 2019 and April 2021, LIEU received over $1.8 million, which came directly from fraud victims who were tricked into sending funds to LIEU's accounts.  After receiving this money, LIEU quickly withdrew or transferred it to various other individuals or entities.  The investigation concerns violations of 18 U.S.C. § 1956(a)(1)(B)(i) (Laundering of Monetary Instruments), 18 U.S.C. § 1957(a) (Transactional Money Laundering), 18 U.S.C. § 1343 (Wire Fraud), and 18 U.S.C. § 1344 (Bank Fraud).

**A.    Background on Business Email Compromises and Money Laundering**

10.    A BEC scam is a sophisticated scam targeting businesses that regularly perform wire transfer payments.  The scam is carried out by compromising legitimate business email accounts through social engineering or computer intrusion techniques to further the unauthorized transfer of funds.

11.    In my training and experience, I know that BEC actors, which include those that social engineer victims or compromise victims' computer systems, often work with a network of money launderers, often referred to as "money mules", to move received fraudulent BEC proceeds through domestic bank accounts to

4

overseas bank accounts or cryptocurrency exchanges.  This allows
the BEC actors to profit from their fraudulent conduct and avoid
getting caught.  Money launderers use and recruit others to use
multiple bank accounts to move money in a series of convoluted
transactions that makes it harder to identify the source of or
who controls the funds.  This is often referred to as "layering"
or "funneling."

12.  The use of "money movement" relating to bank accounts
("movement accounts") to layer or funnel fraud proceeds works as
follows:

a.    Prior to the fraud scheme being perpetrated, a
money launderer is recruited to open a movement account.
Sometimes, a money movement account may be opened months in
advance to allow a "cooling off period", as financial
institutions may scrutinize high-value transactions made to
newly opened bank accounts.

b.    The movement account receives proceeds from the
BEC fraud.

c.    The money launderer, or another individual
involved in the BEC fraud, will engage in transactions with the
funds in various ways, such as withdrawing large amounts of cash
from the movement account, using checks or ACH/wire transfers.
Often, the beneficiaries of the transactions are other movement
accounts, an overseas bank account or cryptocurrency exchange.

13.  Suspected money launderers often open fictitious or
"sham" companies that have no true business purposes so they can
open bank accounts in the name of those businesses.  This use of

a business entity and its bank accounts further attenuates the link between the fraud funds, their illegal source, and the ultimate recipients of the funds.  Suspected money launderers may also steal another individual's identity to establish the "sham" companies and bank accounts.

**B.   The Money Laundering Conduct Under Investigation**

14.  According to subpoenaed records, LIEU has opened at least 11 accounts at seven separate financial institutions since 2017.  These institutions include banks such as Bank of the West, East West Bank, JP Morgan Chase, Boeing Employees Credit Union, and Bank of America, among others.  In addition, LIEU has eight Schools First Credit Union accounts that were opened prior to 2010, at least two of which remain open at this time.

15.  According to subpoenaed records from East West Bank, checking account number 2013031923 ("SUBECT ACCOUNT 1") is associated with LIEU's name, Social Security Number, and Driver's License.  From July 2020 to April 2021, deposits in the account totaled about $710,888.42, and the withdrawals totaled about $710,887.97.  LIEU's average monthly withdrawals and deposits were about $71,088.  The records indicated a pattern in which LIEU received checks and deposited cash from various sources and then appears to have rapidly transferred funds to Coinbase account #8889087930.  From August 2020 to April 2021, LIEU transferred about $390,000 to this account, in amounts ranging from $100 to $50,000, many of which occurred in the same day.

a.    On applications for account openings at multiple financial institutions, LIEU lists her occupation as a pharmacy technician.

b.    Based on records obtained from CVS, LIEU is employed as a Pharmacy Technician and earns an average of approximately $1,240 net salary per month.  This is inconsistent with the quantity and amount of deposits and withdrawals typical of activity in SUBJECT ACCOUNT 1.

c.    Additionally, SUBJECT ACCOUNT 1 received three separate incoming wire transfers with the description listed as "Commercial Foodservice Repair, Inc."  The transfers were as follows: $55,000 on February 4, 2021; $189,000 on February 16, 2021; and $182,000 on February 22, 2021.

d.    Commercial Foodservice Repair, Inc., was fraudulently induced to wire funds to SUBJECT ACCOUNT 1 in February 2021.  According to investigative reports, SUBJECT ACCOUNT 1 was listed as a recipient of the fraudulently sent funds.  On July 29, 2022, the FBI interviewed Samuel Campbell (Campbell), Chief Financial Officer of Commercial Food Service Repair Inc. (FSR).  Campbell stated that between February and March 2021, Campbell's business email account was compromised, and rules were set up in his inbox that allowed an intruder to communicate with the company's controllers regarding wiring instructions and payment information.  As a result, FSR was fraudulently induced to send $671,000 to false customers.  Campbell subsequently filed IC3 report #I2103121156530271 detailing the fraud scheme.

16.   Subpoenaed records from Coinbase, Inc. account
5a7708984010e506828ccfa3 ("SUBJECT ACCOUNT 2"), indicate the
account is associated with LIEU's name, Social Security Number,
and Date of Birth.  A total of $520,660.77 of Bitcoin was
purchased, and $574,924.84 worth of Bitcoin was sent from the
wallets associated with SUBJECT ACCOUNT 2 over the life of the
account.  During this same time period, the account received
$1,903.65 in Bitcoin into wallets associated with the user.  The
records also indicate that LIEU often purchased Bitcoin multiple
times in the same day.  For example, on February 25, 2021 LIEU
purchased Bitcoin in the amounts of $19,587.49 and $58,883.09 at
22:09 and 22:58 respectively.  This is not an isolated
occurrence and appears to have happened multiple times over the
life of the account.

17.   Subpoenaed records pertaining to Bank of the West
account 060226966 ("SUBJECT ACCOUNT 3"), which is associated
with LIEU's name, Social Security Number, and driver's license,
indicate relatively little activity with the exception of the
period between July 1, 2020 to August 31, 2020.  On July 9, 2020
SUBJECT ACCOUNT 3 received a wire in the amount of $955,000 from
victim F.D.L.'s Fifth Third Bank account.  Subsequently, Lieu
initiated two outgoing wires, totaling $400,000, from SUBJECT
ACCOUNT 3 on July 15, 2020 to separate parties.

a.   The wire transfer received in SUBJECT ACCOUNT 3
in the amount of $955,000 corresponds to a business email
compromise scheme in which victim D.C. was fraudulently induced
to send $955,000 to SUBJECT ACCOUNT 3 for what he believed was a

home purchase.  When the FBI interviewed D.C., he confirmed the
details of the report he filed with law enforcement and stated
that he was fraudulently induced to send the funds to SUBJECT
ACCOUNT 3.

18.

19.  On February 14, 2023, a federal grand jury returned an
indictment charging LIEU with three counts of violating 18
U.S.C. § 1956(a) (Laundering of Monetary Instruments) and three
counts of violating 18 U.S.C. § 1957(a) (Transactional Money
Laundering).

20.  Based on the investigation described above, probable
cause exists to believe that evidence, fruits, and
instrumentalities of a violation of the SUBJECT OFFENSES will be
found on LIEU.

**V.  ADDITIONAL TRAINING AND EXPERIENCE ON MONEY LAUNEDRING**

21.  Based on my training and experience, and my
discussions with other agents who investigate such offenses, I
know the following:

a.  Activity consisting of regular rapid movement of
funds into and out of bank accounts, with little to no
aggregation of withdrawals or deposits that could be made
simultaneously, is indicative of laundering and fraud
trafficking.

b.  Money mules who establish bank accounts for
fraudulent activity keep paperwork associated with the bank
account's opening in their homes, such as welcome documents,

issued debit cards or checks and, for business bank accounts, company incorporation documents.

22.  Based on my training and experience, and my discussions with other agents who investigate such offenses, I believe that the following items will be located on LIEU and on digital devices in LIEU's possession:

a.  Banking and financial institution records, wire transfer records, bank statements, cancelled checks, deposit slips, check registers, record of money orders, cashier's checks, and official bank checks, savings passbooks and statements of account(s), safe deposit box keys[1] and records and business and personal ledgers evidencing financial transactions.

b.  Materials reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of funds, financial records, records that may indicate ownership of cash and funds, including calendars, address books, telephone or other contact lists, hard copy correspondence, notes, photographs, and videos.

c.  Communications between co-conspirators containing wiring instructions, amounts, and account information being used in schemes to launder funds.

d.  Digital devices containing the items described above in paragraph 19(a) through 19(c).

---

[1] Based on my training and experience, and my conversations with other agents, I know that individuals who commit the Subject Offenses often put illegal proceeds and or evidentiary items in safe deposit boxes for safekeeping.

## VI.   <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[2]

23.   Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,

---

[2] As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

   c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

  24. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so
many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

25.  Based on my training and experience, I know that
individuals engaged in trafficking fraud proceeds typically
receive instructions via text message, email, and encrypted
communication applications regarding when and where to send the
proceeds.  These communications platforms are most often
accessed using a cellular device.  Additionally, the rapid
movement of funds typical of LIEU's accounts require fast,
reliable, and consistent coordination between sending and
receiving parties.  A cellular device is the most common and
effective tool to accomplish such communication between parties.
As such, I believe evidence of LIEU's trafficking of illicit

funds will likely be found on a cellular device in her possession.

26.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

c.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

d.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

e.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that

appears to have a biometric sensor and falls within the scope of the warrant: (1) depress SERENA LIEU's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of SERENA LIEU's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

27.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

28.  For all the reasons described above, there is probable cause to believe that the evidence of the SUBJECT OFFENSES, as described above and in Attachment B, will be found on SERENA LIEU, as further described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this ____ day of
February, 2023.

_____
HON. PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE